Filed 1/26/22  P. v. Fontes CA1/3
Opinion on remand from Supreme Court
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　Plaintiff and Respondent,<br><br>v.<br><br>PETERSON WILLIAM FONTES,<br><br>　Defendant and Appellant. | A159406<br>A162101<br><br><br>(Napa County<br>Super. Ct. No. 19CR001470) |

　　　As a result of cutting holes into porta-potty units and then using those holes to touch the genital openings of female victims who were urinating, defendant Peterson William Fontes was convicted by a jury of forcible sexual penetration by a foreign object (Pen. Code [1] § 289, subd. (a)(1)(A)) (two counts), second-degree burglary (§ 459), and felony vandalism (§ 594, subd. (b)(1)).  He was sentenced to an aggregate term of 16 years and eight months.

---

[1]　All further undesignated statutory references are to the Penal Code.

1

Defendant appealed, seeking reversal or a new trial on the forcible sexual penetration convictions; he also sought additional presentence credit. (case No. A159406). We remanded for the trial court to award an additional two days of presentence credit and otherwise affirmed the judgment. Defendant also appealed (case No. A162101) from an order which, in pertinent part, awarded Jane Doe 1 restitution in the sum of $4,259.60 plus ten percent interest per annum from the date of sentencing. We affirmed.[2] In this opinion, our conclusions remain unchanged.

After we filed our opinion, the Governor signed new sentencing legislation that amended sections 654 and 1170, subdivision (b), effective January 1, 2022. On December 15, 2021, in response to defendant's petition for review, the Supreme Court remanded the case to us with directions to vacate our prior decision and "reconsider the cause in light of" the sentencing legislation in "Senate Bill No. 567 (Stats. 2021, ch. 731), Assembly Bill No. 124 (Stats. 2021, ch. 695), and Assembly Bill No. 518 (Stats. 2021, ch. 441)." In case No. A159406, defendant has submitted a supplemental brief. The Attorney General has had the opportunity to file supplemental briefing, but has not done so. (Cal. Rules of Court, rule 8.200(b).)

We agree with defendant the matter should be remanded for resentencing under the new sentencing law effective January 1, 2022 and, accordingly, we vacate our September 30, 2021 decision. In case No. A159406, the sentences are vacated, the matter is remanded to the trial court for resentencing under the new sentencing laws effective

---

[2]     By our order filed August 23, 2021, the appeals were consolidated for oral argument and decision.

January 1, 2022 and for correction of its miscalculation of presentence credit. In all other respects, the judgment is affirmed. In case No. A162101, the January 13, 2021 order of restitution is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

The forcible sexual penetration charges arose from two separate incidents at outdoor festivals in 2019 – one in Napa County (Jane Doe 1) and the other in Alameda County (Jane Doe 2). The prosecution's theory was that on each occasion defendant cut holes in the walls of adjacent porta-potty units, surreptitiously watched through the holes as Jane Doe 1 and Jane Doe 2 urinated, and reached through the holes and penetrated their genital openings with his fingers.

### 1. May 12, 2019 Incident (Jane Doe 2)

On May 12, 2019, Jane Doe 2 was working at a festival in Alameda County. That afternoon she left her booth to use one of three porta-potty units, specifically the larger handicapped unit. She pulled down her pants and underwear and squatted above the toilet with her hands on her knees. She felt something touching her posterior and at first thought it was her shirt, but then realized it was a hand. She looked between her legs and saw a pale, white hand that looked male. "[T]he hand was pretty much in [her] vagina like touching [her], grabbing [her]." She felt fingers on her labia. At the time the fingers were grabbing between "[her] vaginal lips," "[i]t was definitely discomforting. It was . . . a lot of pressure." The hand was "[s]queezing" and the fingers were "wiggly." She "freaked out," could not believe there was a hand, felt scared, and did not feel like she could move – she felt like she "got stuck." She screamed, jumped up, "peed all over" herself, pulled up her underwear, and got out of the bathroom.

3

She felt "scared," "[c]onfused," "[n]ervous," and "[e]mbarrassed." After she screamed, the hand disappeared "back into the hole it came from." She was "rattled," felt "a tightness in [her] chest," and her "head started hurting." The touching lasted "three seconds." The incident lasted "no more than 20 seconds" from the time she pulled down her pants to when she pulled them up. Once outside, Jane Doe 2 did not see anyone running but the people outside told her that they had seen someone run behind the porta-potty unit and down the street.

Mark Gerhard, who was standing in line to use a porta-potty unit, heard Jane Doe 2 screaming when she was inside. She exited and said, "there was a hand." Gerhard saw a man exit the adjacent porta-potty unit and run away in a hurry; Gerhard did not see the man's face but described him as "[W]hite, Asian, or Hispanic," and having very short hair, a slight to medium build, and wearing a black shirt. Gerhard was not asked to identify defendant as the man he saw fleeing the area. Gerhard pursued the man but was unable to find him. When Gerhard returned to the porta-potty unit area he saw Jane Doe 2 "crying [and] shaking;" he called 911 and stayed with her until the police arrived.

Alameda Police Officer Eric McKinley met with Jane Doe 2 at the police station one block from the festival. Visibly shaken, voice unsteady, and eyes puffy and watery as if she had been crying, Jane Doe 2 explained that a hand touched her genitalia as she was urinating in a porta-potty unit. She initially estimated she was touched for three seconds, but then said it was two seconds.

Officer McKinley walked to the festival and photographed the damaged porta-potty unit used by Jane Doe 2 and the damaged

4

adjacent porta-potty unit; the units were "set up against each other," with a small gap of approximately three or four inches between the units; and the jury was shown photographs of the damaged units. There was a small four-side rectangular hole (six inches by five inches) in the wall of the unit used by Jane Doe 2, and there was also a small third-sided hole cut to operate as a flap in the wall of the adjacent porta-potty unit. The holes in the units "were in line horizontally, but vertically they were askew." However, the officer was able to see between the units when the flap was moved to reveal the hole in the porta-potty unit adjacent to the unit used by Jane Doe 2. The holes appeared to have been cut by hand with a sharp object and were approximately one and one-half feet above the ground.

### 2. *May 25, 2019 Incident (Jane Doe 1)*

On May 25, 2019, Jane Doe 1 attended a festival in Napa County. That evening, she entered the fifth porta-potty unit on the left bank of handicap units. Because the unit was dark, she turned on her cell phone light. She held her phone in her mouth, pulled down her underwear, hiked up her dress, squatted above the toilet seat, and started to urinate. "[M]aybe two seconds" later, she saw that her stream of urine "started to just spray everywhere." She looked down and felt something "tap" or "poke[] her vagina." The first poke was on her perineum. She looked more closely and saw a hand facing palm up with the index finger and thumb pointed up and the remaining fingers curled into the palm. The hand was clean, well-groomed, and belonged to a white man. Jane Doe 1 felt a second tap on her perineum and then a finger was asserted into her vagina; she was able to describe the manner of insertion. She quickly tried to grab the hand but could not

5

do so.  Approximately seven seconds elapsed between when she felt her urine spray and when she tried to grab the hand.  She yelled and exited the unit while urinating; she yelled again for help and said someone stuck his finger in her vagina.

Jane Doe 1 saw two security guards, but they were "dismissive" of her complaint.  She showed the security guards the area behind the porta-potty units, which at approximately two feet wide was sufficient for someone to shimmy behind the units.  She then showed one of the security guards the hole in the porta-potty unit she had used and the hole in the adjacent unit.  Similar to the holes cut at the Alameda County fair, Jane Doe 1 described the hole in her unit as rectangular, approximately six by eight inches, with straight edges that were "meticulously cut," and approximately one and a half feet above the ground, while the hole in the adjacent unit was similar but cut only on three sides so that it operated as a flap.

Jane Doe 1 also spoke with the festival site operations coordinator, Michael Marzulli, who testified concerning the layout of the festival, including the porta-potty units.  Marzulli confirmed that between the fence (enclosing the festival grounds) and the porta-potty units there was a space wide enough for him to sidestep along the rear of the porta-potty units.  After speaking with Jane Doe 1, Marzulli pulled back the fence line, walked to the rear of the porta-potty units, and saw that someone had cut a hole in four units.  After further investigation, festival employees discovered four additional porta-potty units had been cut with holes, for a total of eight units.

Jane Doe 1 called 911 and Detective Brandt Keown responded to the call at the festival.  Keown and Jane Doe 1 went to the police

6

station, where they spoke for approximately one and one-half to two hours; he testified she was angry and frustrated as well as frightened. She described the incident as "one touching" and as a "poke." After speaking with the officer, Jane Doe 1 was examined by nurse practitioner Kari Cordero who photographed abrasions in her genital area. Jane Doe 1 had a burning sensation in her vagina after the incident that lasted two days. Also, in attempting to grab the man's hand she strained her lower back and subsequently received chiropractic treatment for the pain. She saw a therapist every week for post-traumatic stress disorder and depression. Cordero testified that she found multiple abrasions in Jane Doe 1's perineum, which indicated blunt force trauma. The physical examination was consistent with Jane Doe 1's report of the assault.

### 3. Police Investigation

Following the May 25 assault on Jane Doe 1, the next day (May 26), festival manager Marzulli arranged for the damaged porta-potty units to be repaired and patches were put over the holes. At approximately 9:00 p.m. Marzulli saw defendant slide out from behind the porta-potty area where Jane Doe 1 had been assaulted and exit through a break in the fence. Marzulli grabbed defendant by the arm, and asked him, "[w]hat are you doing back here?" Defendant said he was urinating. Marzulli noticed defendant did not have an admission wrist band for the festival. Defendant got aggressive and tried to leave, but Marzulli detained him.

Defendant was transported to the Napa police department where he met with Detective Keown. A photograph of defendant was taken, and his hands were examined – they had some recent scratches and

small cuts, but were otherwise well-cared for and clean. Defendant was described as five feet four inches tall and approximately 150 pounds. Keown later went to defendant's apartment, where he found a double-edged wallboard saw (serrated blade with teeth on both sides) and a flyer for a festival in Kern County.

When the police detained defendant, he was found holding a Samsung Galaxy cell phone in his left hand. The police also recovered a key fob for a Lincoln vehicle that was later located and visible in the center console was an Apple iPhone. The police took custody of both cell phones. Dustin Dodd, an expert in cell phone and forensic analysis, testified he had prepared a report concerning the videos and digital photographs found on the phones. One cell phone's history included internet searches concerning the Alameda and Napa festivals, while the other cell phone had several fliers for the Napa festival. One cell phone also contained videos and digital photographs. The videos included women urinating with their genital areas exposed inside porta-potty units and a woman "orally copulating a male in a porta-potty" unit at the very end of which defendant "turns the phone around to stop the video and is captured briefly by the camera as he turns the phone around." The digital photographs included images of women urinating and a selfie photograph of defendant inside a porta-potty unit; all the media appeared to have been taken at the Napa and Alameda festival grounds between May 11 and May 25, 2019.

### 4. Defendant's Prior Uncharged Offense in Brazil

The prosecution also presented the testimony of Leonardo Silva, "Chief of Police" of one of the over 30 police stations in Brasilia, Brazil. As Chief of Police, Silva managed the local police force and also had

some "judicial powers" including "indicting suspects" and "conducting interrogations."

On October 14, 2018, Silva questioned defendant concerning his conduct at an event in a city park. Defendant admitted he had damaged temporary portable "chemical toilets" (the "same" as porta-potty units), which were specifically designated for female use. Defendant said he was motivated to drill holes in the toilets after he had watched a video about watching women using toilets. When asked if his objective was to "satisfy his lewdness," defendant "confirmed" that his objective was "to satisfy his sexual desires." However, defendant denied being able to see any women inside the toilets even though he had damaged six toilets and watched for 30 to 40 minutes. Defendant repeatedly said he was deeply ashamed and that it was the first time he had tried to view women urinating in portable units.

### 5.    *Defense Case*

Defendant did not testify or present any witnesses.

In closing, defense counsel argued defendant was not the man who sexually assaulted the two women, noting that no one identified defendant as the assailant and his hands did not match the descriptions given by the women. Alternatively, counsel argued the assailant's sexual penetrations were not accomplished with sufficient force to overcome the will of the victims, noting the brevity of the penetrations and the lack of visible physical injuries suffered by the victims.

DISCUSSION

CASE NO. A159406

**I.   There Was Sufficient Evidence to Support Convictions for Forcible Sexual Penetration by Means of Force or Fear**

Defendant contends his convictions for forcible sexual penetration must be reversed for insufficient evidence.  We disagree.

A conviction for violating section 289, commonly referred to as forcible sexual penetration, requires the prosecution to prove several elements: defendant committed an act of penetration for the purpose of sexual gratification, arousal, or abuse; the act was committed by using a foreign object; the other person did not consent; and the penetration was accomplished by the coercive means of force, violence, duress, menace, *or* fear of immediate and unlawful bodily injury to the other person.  (§ 289, subd. (a)(1)(A); italics added.)

Defendant's sole substantive argument is that there was insufficient proof that he accomplished the sexual penetrations by means of force.[3]  According to defendant, the evidence did not show coercive force because the digital penetrations were accomplished by "stealth or trick" or "furtiveness and subterfuge" in that he hid himself and touched the victims when they had voluntarily exposed their

---

[3]   While the jury was also asked to consider the other coercive means of violence, duress, menace, or fear of immediate and unlawful bodily injury, defendant presents no substantive argument challenging the sufficiency of the evidence as to those components.  Rather, he merely argues, in a conclusory fashion, that the evidence is not sufficient to support violence, duress, menace or fear of immediate and unlawful bodily injury.  Defendant explains his limited argument by asserting, "[a]s is apparent from the record, this case was prosecuted as one based on force."

10

genitals and were in a vulnerable position.  This argument is without merit.

We review the record for "substantial evidence" by examining "the entire record" and "draw[ing] all reasonable inferences in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  Although circumstances might also reasonably be reconciled with a contrary finding, it does not warrant reversal of the judgment and . . . [the] verdict will not be set aside unless the record clearly shows that there is not sufficient evidence based upon any hypothesis whatsoever.  [Citation.]" (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071 (*Thomas*.)  "The same standard also applies in cases in which the prosecution relies primarily on circumstantial evidence." (*People v. Young* (2005) 34 Cal.4th 1149, 1175.)

We initially reject defendant's argument that the convictions cannot be sustained because there was no "additional physical act constituting force beyond the mere sexual act itself," as he simply "inserted his fingers on and into the outer genitalia of these women," thereby accomplishing the act without having to overcome their will.  However, defendant's argument too narrowly defines the element of "force" within the meaning of section 289.

Section 289 " 'primarily guards the integrity of a woman's will and the privacy of her sexuality from an act of [penetration] undertaken without her consent.  Because the fundamental wrong is the violation of a woman's will and sexuality, the law. . . does not require that "force" cause physical harm.  Rather, in this scenario,

11

"force" plays merely a supporting evidentiary role, as necessary only to insure an act of [penetration] has been undertaken against a victim's will.' " (*People v. Griffin* (2004) 33 Cal.4th 1015, 1025 (*Griffin)* [discussing the law of rape], citing *People v. Cicero* (1984) 157 Cal.App.3d 465, 475 (*Cicero*), disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248.) " 'Force' includes circumstances where the victim did not want to engage in the act and the evidence does not otherwise establish the victim's positive cooperation in act or attitude." (*Thomas, supra*, 15 Cal.App.5th at p. 1071, citing *People v. Young* (1987) 190 Cal.App.3d 248, 258.) Our Supreme Court has explicitly rejected the suggestion that the necessary force "actually means force '*substantially* different from or *substantially* greater than' the physical force normally inherent in an act of consensual sexual [penetration]. (*Cicero, supra*, 157 Cal.App.3d at p. 474, italics added)." (*Griffin, supra,* at p. 1023.) Instead, the Supreme Court has made it quite clear that " ' " *[t]he kind of physical force is immaterial*; . . . it may consist in *the taking of indecent liberties with a woman . . . .' " ' "* (*Griffin, supra*, at p. 1024, first italics added by *Griffin* court, second italics added.)

Given the broad definitions used to describe the "force" necessary to satisfy that element within the meaning of section 289, we reject defendant's argument that the evidence was insufficient. The record undisputedly shows that the victims did not want to be penetrated and there is zero evidence establishing the victims' "positive" cooperation by act or attitude. (*Thomas, supra*, 15 Cal.App.5th at p. 1072.) Although lack of consent and force are separate elements that must each be proven (*In re Jose P.* (2005) 131 Cal.App.4th 110, 116), the same

12

evidence is often relevant to establish lack of consent and force, which elements are both directly linked to the overbearing of the victim's will. (*People v. Maury* (2003) 30 Cal.4th 342, 403; see *People v. Iniguez* (1994) 7 Cal.4th 847, 856 (*Iniguez*).)

Moreover, even if the evidence were insufficient to show "force" within the meaning of section 289, the jury could have found defendant accomplished the penetrations by use of the coercive means of fear of immediate and unlawful bodily injury.[4] Like the force necessary to overcome a victim's will, "[i]n order to satisfy the [fear] component, the extent or seriousness of the injury feared is immaterial." (*Iniguez, supra,* 7 Cal.4th at p. 856.) Here, there is no question that defendant's penetrations while the victims were urinating in the porta-potty units were acts of " '[s]udden, unconsented[] to' " touching, and the ensuing penetrations of their genital openings, however brief, " 'would reasonably cause one to react with fear.' " (*Thomas, supra*, 15 Cal.App.5th at p. 1071, quoting *Iniquez, supra*, at p. 858.) By his conduct, defendant violated "the [victims'] enhanced level of security and privacy," providing him with the advantage of " 'shock and surprise which [might] incapacitate the victim(s).' " (*Iniquez, supra*, at p. 858.) "Any man or woman . . . [finding] himself or herself in this situation

<hr>

[4] While the prosecutor and defense counsel focused their closings on the coercive means of "force" by which defendant accomplished the sexual penetrations, the jurors were free to consider other coercive means of accomplishing the acts, which included "fear of immediate and unlawful bodily injury." Because the jurors were allowed to convict defendant if they found he used fear of immediate and unlawful bodily injury, we may sustain the convictions if there is substantial evidence demonstrating the use of that coercive means of accomplishing the sexual penetrations.

could reasonably react with fear of immediate or unlawful bodily injury." (*Ibid*.)

Accordingly, we conclude there was sufficient evidence to support the forcible sexual penetration convictions.[5]

## II.     No Error in Jury Instructions

### A.     CALCRIM No. 1045

#### 1.     *Relevant Facts*

Defense counsel requested the language in CALCRIM No. 1045, which states as follows.

"The defendant is charged in counts one and six with sexual penetration by force. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act of sexual penetration with another person. Two, the penetration was accomplished by using a foreign object. Three, the other person did not consent . . . to the act. And four, the defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the other person.

"Sexual penetration means penetration, however slight, of the genital or anal opening of the other person for the purpose of sexual abuse, arousal, or gratification.

"A foreign object, substance, instrument, or device includes any part of the body except a sexual organ. [In the pattern instruction at this point, it is suggested as optional language that the court advise the jury, "Penetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort."]

"In order to consent, a person must act freely and voluntarily, and know the nature of the acts.

---

[5]     In light of our determination, we need not address whether the evidence was sufficient to demonstrate that the victims' wills were overborne by other coercive means, i.e., violence, duress, or menace, which components were also submitted for the jury's consideration.

14

"An act is accomplished by force if a person uses enough physical force to overcome the other person's will.

"Duress means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to.

"When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant.

"Menace means a threat, statement, or act showing an intent to injure someone else.

"An act is accomplished by fear if the other person is actually and reasonably afraid or if she is actually but unreasonably afraid and the defendant knows her fear and takes advantage of it."

At the jury instruction conference, the court asked the parties if the optional language defining "penetration for sexual abuse" was necessary. Defense counsel took the position that the proposed language was not relevant as "penetration for sexual abuse" was not an issue, and the prosecutor agreed. Without objection, the trial court ruled the optional language regarding the definition of the phrase "penetration by sexual abuse" would not be given because there was no substantial evidence to support that theory.

### 2. *Analysis*

On appeal, defendant argues the trial court erred in failing to instruct with the CALCRIM No. 1045 optional language for the definition of the phrase "penetration for sexual abuse" on the basis that the court had a sua sponte duty to do so based on *People v. White* (1986) 179 Cal.App.3d 193 (*White*). We disagree.

15

Defendant has forfeited his claim of instructional error by his failure to object and his specific request that the court not instruct the jury on the definition of "penetration for sexual abuse" using the optional language in CALCRIM No. 1045. (See *People v. Ryan* (1999) 76 Cal.App.4th 1304, 1318-1319 [trial court has no sua sponte duty to provide amplifying instructions for commonly understood terms in the absence of a request]; *People v. Ahsbahs* (1946) 77 Cal.App.2d 244, 249 [in the absence of a request the trial court is not required to define "lewd" and "lascivious" as it is not necessary to define to the jury every word found in a statute describing a crime].)

Even if defendant had not requested the language be omitted, the trial court did not have a sua sponte duty to advise the jury of the definition of "penetration for sexual abuse." CALCRIM No. 1045's optional language is taken from the decision in *White, supra*, 179 Cal.App.3d 193, which held that the phrase "penetration for sexual abuse," as used in section 289, means " 'penetration . . . accomplished for the purpose of causing pain, injury or discomfort' " directed to a victim's "sexual or 'private' parts" (179 Cal.App.3d at p. 205), thereby adopting the commonly understood dictionary definitions of "abuse" and "sexual." [6] The *White* court did not hold, as defendant contends,

---

[6] "The 'abuse' of a person commonly means the mistreatment of the person 'in a harmful, injurious, or offensive way.' (Random House Dict. of English Language (2d ed. 1987) p. 9.) Abuse is not limited to causing physical injury to the person; it includes emotional harm by the use of offensive conduct. (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 6; Webster's 3d New Internat. Dict. (1986) p. 8; American Heritage Dict. (2d college ed. 1985) p. 70; Funk & Wagnalls Standard College Dict. (1974) pg. 7.) Thus, for example, conduct intending to insult or humiliate a person is the 'abuse' of the person. (E.g., American Heritage Dict., *supra*, at p. 70.)" (*In re Shannon T.* (2006) 144

that the phrase "penetration for sexual abuse" has a technical legal meaning in the context of the sexual penetration statute.  Instead, it merely confirmed that the phrase "penetration for sexual abuse" as used in section 289 is to be interpreted as it is " ' " 'commonly understood by those familiar with the English language and is not used in a technical sense particular to the law.' " ' " (*Griffin, supra,* 33 Cal.4th at pp. 1022-1023.)  " 'When a word or phrase " 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " [Citations.]  A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning.  [Citation.]' " (*Ibid.*, quoting *People v. Estrada* (1995) 11 Cal.4th 568, 574, italics in original.)

We also reject defendant's contention that because the jurors were not instructed on the definition of "penetration for sexual abuse" they could have viewed the mere act of penetration of the genital opening as sufficiently abusive to convict him.  The given instructions do not equate "penetration" with "abuse."  Instead, the jurors were specifically informed that to convict defendant they must find he had "the specific intent" to penetrate the women "for the purpose of sexual abuse, arousal or gratification."  (CALCRIM No. 252.)

We also are not persuaded by defendant's complaint that his case is "unusual" in that it presents what is likely a rare instance where the penetration may have been for purposes other than sexual arousal,

Cal.App.4th 618, 622.)  "Sexual" is defined as "[o]f pertaining to, affecting, or characteristic of sex, the sexes, or the sex organs and their functions." (American Heritage Dict. (2d college ed. 1982) p. 1124.)

gratification, or abuse. According to defendant, in the absence of a definition of sexual abuse, "the jurors could have concluded that the mere act of genital penetration was sufficient to establish sexual abuse. However, had there been [an] instruction that sexual abuse requires an intent to injure or cause pain, at least some of the jurors likely would have voted to acquit [him] . . ., finding instead that his intent was to embarrass, humiliate and frighten the women. . . ." Defendant's argument falters at the outset because it is premised on too narrow a definition of sexual abuse. Had the omitted definition be given, the jury would have been advised that defendant could also be found guilty if the sexual penetration was committed for "the purpose of *causing* pain, injury, *or discomfort*" to the women. (CALCRIM No. 1045; italics added.) Here, there was ample evidence to support a reasonable juror's finding that defendant must have known that digital penetration of the women would cause discomfort.

Lastly, we reject defendant's argument that his trial counsel was ineffective because there could be no rational, tactical, or strategic purpose for failing to request an instruction on the definition of the phrase "penetration for sexual abuse." Because the "discomforting" nature of defendant's actions was self-evident, defense counsel could have determined, reasonably and strategically, that the optional language in CALCRIM No. 1045 would not inure to defendant's benefit. Consequently, we reject defendant's claim of ineffective assistance of counsel.

For the stated reasons, defendant's request for reversal based on the trial court's failure to instruct the jury using the optional language in CALCRIM No. 1045 fails.

18

## B.    CALCRIM No. 1191B

Over defense counsel's objection, the court, using language in CALCRIM No. 1191B, advised the jury as follows:

"The People presented evidence that the defendant committed the crimes Sexual Penetration by Force, Assault with Intent to Commit Sexual Penetration, and Sexual Battery as charged in Counts 1, 2, 5, 6, and 7.

"If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of another crime.  The People must still prove each charge and allegation beyond a reasonable doubt."

Defendant contends the instruction was "constitutionally infirm" as it interfered with the presumption of innocence and allowed the jury to infer guilt of the charged offenses and to make a finding based on a standard of proof less than beyond a reasonable doubt.

He acknowledges that his constitutional challenge is foreclosed by *People v. Reliford* ((2003) 29 Cal.4th 1007 (*Reliford*) [reviewing CALJIC former No. 2.50.1]) and *People v. Villatoro* ((2012) 54 Cal.4th 1152 (*Villatoro*) [reviewing CALCRIM former No. 1191B]).  In those cases, our high court upheld similar propensity evidence instructions against constitutional challenges that the instruction interfered with the presumption of innocence and impermissibly lowered the prosecutor's burden of proof.  (*Reliford*, *supra*, at pp. 1012-1016; *Villatoro*, *supra*, at pp. 1167-1168.)  In any event, we agree with those

19

cases and other appellate decisions in concluding that the trial court properly instructed the jury using CALCRIM No. 1191B. (See *People v. Meneses* (2019) 41 Cal.App.5th 63, 67-68; *People v. Phea* (2018) 29 Cal.App.5th 583, 608.)[7]

## III. No Prejudicial Error in Prosecutor's Closing Argument

Defendant contends the prosecutor committed prejudicial error by misstating California's modified acquittal-first rule during closing argument. We disagree.

### A. Relevant Facts

### 1. *Trial Court's Instructions*

Before closing arguments, the trial court informed the jury regarding their consideration of the charged crimes, lesser offenses, and the relevant evidence. The court also instructed regarding the verdict forms (CALCRIM No. 3519).

The court specifically instructed the jurors on the elements of the charged offenses of forcible sexual penetration (charged in count one for Jane Doe 1 and in count six for Jane Doe 2), burglary (count 3), vandalism causing damage over $400 (count 4), assault with the intent to commit sexual penetration by force (lesser offense as charged in count two (Jane Doe 1) and count seven (Jane Doe 2)), misdemeanor sexual battery (lesser offense as charged in count five (Jane Doe 1)), and the lesser offenses of attempted sexual penetration by force,

---

[7] Because defendant presents his appellate argument for purposes of preserving the issue for later review by another court, we do not address his additional arguments that his constitutional challenge was not forfeited for review or his contention that his trial counsel was ineffective for failing to make a constitutional challenge in the trial court.

20

attempted burglary, attempted vandalism, simple battery and simple assault. The jurors were then advised:

"If all of you find that the defendant is not guilty of a greater charged crime, you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. A defendant may not be convicted of both a greater and lesser crime for the same conduct.

"Now I will explain to you the crimes affected by this instruction including lesser crimes of the lesser crimes:

"Attempted Sexual Penetration by Force is a lesser crime of Sexual Penetration by Force as charged in Counts [sic] 1 [.]

"Assault with intent to commit sexual penetration by force, as charged in Counts 2 and 7, is a lesser crime of Sexual Penetration by Force as charged in Counts 1 and 6.

"Sexual Battery as charged in Count 5 is a lesser crime of Sexual Penetration by Force.

"Simple Battery is a lesser crime of Sexual Penetration by Force and is a lesser of the lesser crime of Sexual Battery.

"Simple Assault is a lesser crime of Sexual Penetration by Force, and is a lesser of the lesser crime of Assault with Intent to Commit Sexual Penetration, and is a lesser of the lesser crime of Sexual Battery.

"Attempted Burglary is a lesser crime of Burglary.

"Attempted Vandalism is a lesser crime of Vandalism.

"It is up to you to decide the order in which you consider each greater and lesser crime and the relevant evidence, but I can accept a guilty verdict of the lesser crime only if you have found the defendant not guilty of the greater crime.

"For the count in which a greater and lesser crime is charged, you will receive verdict forms of guilty and not guilty for the greater crime and the lesser crime. Follow these instructions before you give me any

21

completed and signed, final verdict form.  Return any unused verdict forms to me, unsigned.

"1. If all of you agree the People have proved that the defendant is guilty of the greater crime, complete and sign the verdict form for guilty of that crime.  Do not complete or sign any verdict form for the lesser crime.

"2. If all of you cannot agree whether the People have proved that the defendant is guilty of the greater crime, inform me of your disagreement and do not complete or sign any verdict form for that crime or the lesser crime.

"3. If all of you agree the People have not proved that the defendant is guilty of the greater crime and also agree the People have proved that he is guilty of the lesser crime, complete and sign the verdict form for not guilty of the greater crime and the verdict form for guilty of the lesser crime.  Do not complete or sign any other verdict forms.

"4. If all of you agree the People have not proved that the defendant is guilty of the greater or lesser crime, complete and sign the verdict form for not guilty of the greater crime and the verdict form for not guilty of the lesser crime.

"5. If all of you agree the People have not proved that the defendant is guilty of the greater crime but all of you cannot agree on a verdict for the lesser crime, complete and sign the verdict form for not guilty of the greater crime and inform me of your disagreement on the lesser crime."

### 2.    *Prosecutor's Closing Remarks*

During closing arguments the prosecutor discussed the jurors' obligations regarding completion of verdict forms and their consideration of the charged crimes, lesser offenses and relevant evidence.  Defendant challenges the italicized portions of the prosecutor's closing remarks set forth in context:

"So we have seven charged offenses, but five different crimes. And for some of these crimes we have what are called lesser offenses.

22

And we'll talk about those a little later. But those are things you only look at if you don't think he committed the greater charged crimes. It looks tricky, and it looks like there's a lot, . . ., but the good news is there's a lot of overlap.

"So, for example, sexual penetration by force in count one is our greater offense. And . . . [the] . . . offense . . . assault with intent to commit sexual penetration is a lesser offense to count one. And the same applies for count six and seven.

"So you only look at counts two and seven if you don't think he committed the greater charged crimes of count one and six. That's just how it works. . . ."

After discussing the evidence that established defendant's sexual penetration by force of Jane Doe 1, the prosecutor discussed proposed lesser included offenses for the charged offenses of sexual penetration, and then returned to a discussion of the sufficiency of evidence to show defendant had committed sexual penetration by force sufficient to overcome the victims' wills. The prosecutor then argued:

"*Now assault with intent to commit sexual penetration is a lesser included crime of sexual penetration by force.*

"*Again, you only look at this count, if you don't believe he committed sexual penetration by force. So the greater count that we just went through. And you are instructed on this because it is the law. Not because they are in play.*

"So assault with the intent to commit sexual penetration, for example, would be if he did what he did but he was unsuccessful in penetrating her vagina. And we know that he did. We know that he penetrated her vagina, because she told us. She has the injury. There's no question here.

"Count one has been proven beyond a reasonable doubt, and he committed that crime, so you don't even get here."

The prosecutor also discussed completion of the verdict forms as follows:

*"So verdict forms.  You are going to get four different packets of verdict forms.  So in the first packet, packet one, sexual penetration by force, you are going to have this verdict form.  And you are going to write guilty here, and then whoever you choose to be the foreperson would date and sign it.*

*"After you write guilty here, you're done with this packet.  You don't move on.  The only way that you would move on is if you find not guilty.  And then you'll move on to the second page.  And it is the same thing.  So you don't move on unless you find not guilty.  But you'll never get to those, because you're going to write guilty here on this verdict form.*

"The next packet that you will get is for burglary.  This one only has two pages.  It's the same thing.  You're going to choose a foreperson.  That foreperson is going to write guilty right here.  Sign and date and then you're done.

"For vandalism, you're going to have three pages in your packet.  Same thing.  Except this one has a special allegation.  So after you write guilty, and sign and date, then you move on to the special allegation.

"The special allegation is for you to decide if the amount of damage is over $400.  So you write true right here, the amount the damage is over $400, and you're done with the packet.

"The last packet you will get is for count six.  This is for the Alameda victim, so Jane Doe 2.  Same exact things.  You're going to [write] guilty here, date and sign, and then you're done with this packet.  You never get to the back pages.

"Now you may deliberate in any order, in any way that you like.  I would suggest starting with the greater offense so the one on top of the packet."

## B.    Analysis

Defendant argues the prosecutor committed prejudicial error by making statements (italicized above) that erroneously misstated California's modified acquittal-first rule by directing the jurors to first consider greater offenses, and only after rejecting the greater, to then

discuss the lesser crimes. This claim is predicated on the principle that a jury may be restricted from returning a verdict on a lesser included offense before acquitting on a greater offense, but the jury may not be precluded from considering lesser offenses during deliberations. (See *People v. Dennis* (1998) 17 Cal.4th 468, 536 (*Dennis*), citing *People v. Berryman* (1993) 6 Cal.4th 1048, 1073 (*Berryman*), overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn.1 & *People v. Kurtzman* (1988) 46 Cal.3d 322, 324-325 (*Kurtzman*).) In other words, a jury should not be told "it must first unanimously acquit the defendant of the greater offense before deliberating on or even considering a lesser offense." (*Dennis*, *supra*, at p. 536, citing *Kurtzman*, *supra*, at pp. 328, 335.)

We initially reject defendant's argument as he failed "to satisfy the general rule requiring assignment of [error] and request for admonition as to any of the comments by the prosecutor of which he now complains." (*Berryman*, *supra*, 6 Cal.4th at p. 1072; *People v. Price* (1991) 1 Cal.4th 324, 460 (*Price*).) No exception is applicable to the general forfeiture rule in this case. Before the prosecutor's closing argument the court had already instructed the jurors on the manner in which they were to consider the charged offenses, the lesser offenses, and the relevant evidence, using CALCRIM No. 3519, which instruction was a correct statement of law. (*Dennis*, *supra*, 17 Cal.4th at p. 536, *Berryman, supra*, at p. 1073, *Kurtzman, supra*, 46 Cal.3d at pp. 324-325.) Had an objection been made and admonition requested, the court could have readily and easily remedied any prejudice by re-instructing the jury using CALCRIM No. 3519. (*Price, supra*, at p. 460.)

Nor do we see any merit to defendant's claim that review is required because the prosecutor's remarks "resulted in a due process violation, . . . [raising] a significant question of constitutional law based on undisputed facts." An erroneous argument asserting "an acquittal-first rule" "appears to implicate California law only." (*Berryman*, *supra*, 6 Cal.4th at p. 1077, fn. 7.) Moreover, "[i]n the abstract, an acquittal-first [argument] appears capable of *either* helping *or* harming *either* the People or the defendant. [¶] Such an [argument] 'has the merit, from the Government's standpoint, of tending to avoid the danger that the jury will not adequately discharge its duties with respect to the greater offense, and instead will move too quickly to the lesser one. From the defendant's standpoint, it may prevent any conviction at all; a jury unable either to convict or acquit on the greater charge will not be able to reach a lesser charge on which it might have been able to agree. But it entails disadvantages to both sides as well: By insisting on unanimity with respect to acquittal on the greater charge before the jury can move to the lesser, it may prevent the Government from obtaining a conviction on the lesser charge that would otherwise have been forthcoming and thus require the expense of a retrial. It also presents dangers to the defendant. If the jury is heavily for conviction on the greater offense, dissenters favoring the lesser may throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all, although the jury might have reached sincere and unanimous agreement with respect to the lesser charge.' (*United States v. Tsanas* (2d Cir. 1978) 572 F.2d 340, 346, fn. omitted (per Friendly, J.).)" (*Berryman*, *supra*, at pp. 1077-1078, fn. 7, italics in original.) We therefore reject defendant's

26

assertion that review is necessary as he has not shown the remarks " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.)

Nor do we see any merit to defendant's claim that his trial counsel's failure to object to the prosecutor's closing remarks constituted ineffective assistance. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Defendant's contention that there could be no rational, tactical or strategic purpose in failing to object to the prosecutor's closing remarks is not persuasive. Defense counsel's trial strategy in defending against the charges was two-fold: (1) defendant was not the man who assaulted the victims or alternatively, (2) defendant had not sexually penetrated the women by the use of "enough force to overcome" their wills. "[W]hile requesting an admonition was one tactical option, counsel could have also decided that objecting would focus the jury's attention" on the evidence "in ways that would not be helpful to the defense." (*People v. Harris* (2008) 43 Cal.4th 1269, 1290.) Thus, defendant's claim that reversal is required based on ineffective assistance of trial counsel fails.

Lastly, even if the claim of error were properly before us, we would reject it on the merits. "Plainly the prosecutor did not tell the jury it could not or should not consider a lesser offense unless it first *acquitted* of the greater offense. Instead, the prosecutor did no more than offer the jury a suggested approach to its formal decision making and completion of the verdict forms." (*Dennis*, *supra*, 17 Cal.4th at p.

27

536; italics added; see *Berryman*, *supra*, 6 Cal.4th at p. 1073 [no prejudicial error where in closing argument the prosecutor sought to elucidate certain aspects of the court's instructions and "evidently used a demonstrative aid in the form of a chart 'to make sure that all of you understand . . . how you would work down this ladder of lesser included offenses' "].)

Moreover, a reasonable juror would have understood and applied the court's instructions "as governing how to return the verdicts and findings after completing deliberations." (*Dennis*, *supra*, 17 Cal.4th at p. 537.) And, here, both the court and the prosecutor informed the jury that they could consider the evidence in any order, with the court stating, "It is up to you to decide the order in which you consider each greater and lesser crime and the relevant evidence," which was echoed by the prosecutor's statement, "Now you may deliberate in any order, in any way that you like." No reasonable likelihood exists the jury construed either the prosecutor's closing remarks, singly or together with the instructions, "in a manner contrary to the rule of *Kurtzman*, *supra*, 46 Cal.3d 322." (*Dennis*, *supra*, at p. 537.)

We therefore conclude that reversal is not required based on the prosecutor's closing remarks. The jury's "deliberations were [not] channeled improperly toward a conviction [on greater crimes] to the exclusion of [the] lesser offenses" as the prosecutor's closing remarks "did not impermissibly enhance the risk of unwarranted" convictions on the greater crimes. (*Dennis*, *supra*, 17 Cal.4th at p. 537.)

## IV. Admission of Evidence of Prior Offense in Brazil Was Harmless Error

### A. Relevant Facts

The prosecution sought admission of evidence of the prior offense in Brazil, including defendant's incriminating statements made to Brazilian Chief of Police Silva. Defense counsel objected. In considering the request, the court viewed a videotape of the interrogation (approximately two minutes in length), reviewed a written transcript (translated from Portuguese to English) of the interrogation, and took the testimony of Silva at an Evidence Code section 402 hearing outside the presence of the jury.

The transcript sets forth a series of questions posed by Silva and defendant's responses. Defendant initially confirmed he had no wounds or injuries. Silva then said defendant had been criminally charged for "aggravated harm and sexual bothering," and Silva, "the chief of police here," was at the jail for defendant's "interrogation." Silva informed defendant of his "constitutional right to remain silent," and defendant was asked if he was "going to use" his right to remain silent. Defendant replied, "No, I am going to give my . . . I want to speak."

In response to Silva's substantive questions, defendant admitted he had damaged chemical toilets at "City Park." When asked if he had used the knives he had been carrying and what was his objective, defendant said he was ashamed, had never done that kind of thing before, and had seen an Internet video about watching women in the bathroom. When Silva asked if defendant had acted in order to satisfy his "lewdness," defendant replied, "Yeah, I . . . ." When Silva asked if

29

defendant saw naked women inside the bathroom, defendant said he did not get to see any women inside the bathroom even though he had been watching for approximately a half hour or 40 minutes. Defendant denied an allegation made by an unidentified woman that he had tried to enter a toilet while the woman was inside. He also said he had taken a course for chaplains and that his clergy card was real. When Silva asked if defendant had anything else to say, defendant said, "Sir, I . . . I just, I, I have never done any of those things. I don't have a record. I don't . . . I've never done this, I haven't. I am extremely ashamed." When Silva asked if defendant had a record for contempt or failure to comply, defendant replied, "Oh, that . . . No. But this thing, I was . . . . There was, there was an agreement." Silva said he understood and ended the questioning.

At the Evidence Code section 402 hearing, Silva testified that one of his jobs as Chief of Police was to question suspects. At the outset, a suspect is informed of the right to either remain silent or speak with the officer. That is the only right the officer is required by law to give to the suspect. Before a suspect is entitled to invoke his right to remain silent, he must identify himself and inform the officer whether he has been injured during his imprisonment.

At the October 14, 2018, interrogation there were two police officers and a "court reporter" present with Silva. Silva and the two officers were not in uniform, but one officer was wearing a shirt with "Police" on it. All of the officers were armed with guns. The officers remained outside the jail cell, one or two meters away, and not within reach of defendant, to prevent defendant from trying to "reach for a weapon" or "spit" on the officers. Silva's gun remained concealed at all

30

times, and the other officers did not take out their guns or point them at defendant.

Silva questioned defendant while defendant was inside his jail cell and clad only in his underwear. While some suspects are handcuffed, defendant was not handcuffed because he was not aggressive. The place of interrogation and defendant's state of undress were customary procedures for safety and security reasons. The police station was "grossly understaffed," consisting of only the Chief of Police, and two police officers. The defendant was wearing only underwear for "safety reasons" because in the past sex offenders had killed themselves or attempted to kill themselves. Because Silva did not have officers available to remain at the cells to visually observe the suspects, most of the time Silva did not allow suspects to wear any clothing; Brazil "is very hot, so it's not a problem." It was "common for suspects to be in the cell with just their underwear" because it "reduce[d] the risk of suicide" and their ability to hide "weapon[s] or anything else."

Silva followed standard procedure by first asking the defendant if he had been injured (defendant replied he had not) and then asking if he wanted to exercise his right to remain silent (defendant chose to speak). When asked to describe defendant's demeanor, the officer said he "was very ashamed. In at least three times he told me he was . . . extremely ashamed of what he did;" defendant was not "terribly nervous or aggressive, he was just embarrassed." The officer's demeanor was "professional," as he understood it was his "job to remain calm and try to make the pertinent questions without much judgment." He did not yell and instead spoke in the same manner as he was

31

speaking in court. Silva did not do anything to make defendant speak and always remained approximately one meter from the cell. The questioning "was very quick" and the video recording of the interrogation was "one minute and 42 seconds long." Silva spoke with defendant "the minimum necessary . . . to understand his version of the facts." Defendant never said he did not want to talk. Defendant had the right not to answer one or more questions, but he chose to answer all the questions.

On cross-examination, Silva confirmed that before being placed inside a cell defendant was strip-searched by another officer according to standard security procedures. Silva also confirmed that defendant did not have a constitutional right to have the assistance of a public defender at the police station; a public defender is provided in the "judicial hearing, not the police hearing." Defendant was told he had the right to have his family or a private lawyer assist him, but defendant did not ask for his family or legal assistance and did not provide a telephone number to contact a lawyer on his behalf.

## B. Trial Court's Admissibility Ruling

The trial court issued a tentative ruling that "based on reviewing the case law, listening to the investigator's statements regarding the conversation, as well as the Court's understanding of the Brazilian right to remain silent, and right to counsel and family, and at the time that they apply, having watched the video and reviewing part of the transcript relating to the voluntariness and coerciveness, the Court could be admitting this under various theories of [Evidence Code section] 1101 . . . ." Following further argument by counsel, the trial court confirmed its tentative ruling, finding that defendant's

32

statements were not "coerced. [Defendant] does appear in his underwear, but he seems like he's volunteering a statement. He's asked, are you going to use your right to remain silent after being advised that he has that right. And he says no, I'm going to give my – I want to speak. And then he does so." However, the court limited the admission of prior offense evidence pursuant to Evidence Code section 1101 to the following facts: "this happened in a city park," "there were damaged chemical toilets," defendant tried to watch naked ladies for approximately a half hour or 40 minutes, and defendant said, "he was ashamed."

In explaining its ruling, the court stated that it had looked at "the degree of distinctiveness of the individual shared marks of the crimes and the number of minimally shared marks. And this – when we are talking about identity, we are asking how similar are these crimes, and the way that they're committed, as it relates to identity. And here we have holes cut into a porta-potty, and that's really it. It's a distinctive [modus] operandi. There's one common mark and identifier, and actually there's two, because there's the cutting, and then the watching. And he states that he was watching for a half hour or 40 minutes. And it happened at a public event. [¶] I never thought that I would have a case where there's that calling card. But this is such a strange incident, in itself, cutting holes in a porta-potty at a public event. When you look at it in combination with the other marks and features of this particular crime, it's so unique and distinct that I think it can go to identity."

The court then engaged in the probative/prejudicial balancing analysis required by Evidence Code section 352 and found the

33

probative value of the testimony for purposes of identity, common plan or scheme, specific intent for lewdness (but not the specific intent to commit forceful penetration), motive, and lack of mistake or accident (for which it would later be admitted) would not create a danger of undue prejudice or necessitate an undue consumption of time. However, in exercising its discretion under Evidence Code section 352, the court precluded any mention that (1) an unidentified Brazilian woman said defendant had tried to go into the chemical toilet while she was inside; (2) defendant was a chaplain; and (3) defendant had no record, not even for contempt. At defense counsel's request, the court also excluded any mention that as a result of the Brazilian offense defendant had been arrested and later given a diversion-type suspended sentence providing for no criminal prosecution if he followed through with certain agreed upon terms.

## C.     Trial Proceedings

During the trial the prosecution presented only Silva's testimony as set forth in the Factual and Procedural Background section, *ante*. The jury did not see the videotape of defendant's interrogation and no portion of the transcript was given to the jury. The jury was instructed regarding the limited purposes for which the prior offense evidence was admitted and that it could consider the evidence only for those purposes and no other. [8]  (CALCRIM No. 303, 375.)

---

[8]     Using the language in CALCRIM No. 375, the jury was advised, in pertinent part, as follows: "The People presented evidence that the defendant committed other offenses that were not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offenses and act. . . . [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the

34

### D. Analysis

Defendant contends the trial court committed prejudicial error by admission of the evidence of the prior offense in Brazil, arguing that (1) the proffered evidence was not relevant to prove intent, motive, identity or common plan or scheme, as the offense was not sufficiently similar to be probative in connection with the forcible sexual penetration charges, and was not relevant on the "non-issue of absence of accident or mistake;" (2) the court's refusal to exclude all of the proffered evidence under Evidence Code section 352 was an abuse of discretion; (3) his statements concerning the prior offense were involuntary and violated "his constitutional right to due process and against self-incrimination;"

---

defendant committed the offenses and act, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] The defendant was the person who committed the vandalism offenses alleged in the case; or [¶] The defendant acted with the intent for the crime of Sexual Penetration by Force . . . . [¶] The defendant acted with the intent for the crime of Attempted Sexual Penetration by Force . . . . [¶] The defendant acted with the intent for the crime of Assault with Intent to Commit Sexual Penetration by Force . . . . ¶] The defendant acted with the intent for the crime of Burglary . . . . [¶] The defendant acted with the intent for the crime of Attempted Burglary . . . . [¶] The defendant acted with the intent for the crime of Sexual Battery . . . ; or [¶] The defendant had a motive to commit the offenses alleged in this case; or [¶] The defendant's alleged actions were not the result of mistake or accident; or [¶] The defendant had a plan or scheme to commit the offenses alleged in this case. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and act and the charged offenses. [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the act, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charged in the case. The People must still prove every charge beyond a reasonable doubt."

and (4) the admission of his statements violated the "corpus deliciti rule," which requires proof of the occurrence of a crime independent of a defendant's own statements.  However, even assuming any merit to these arguments, reversal is not an appropriate remedy as defendant has failed to demonstrate prejudice under either state law (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)) or the federal Constitution (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)).

It is well settled under state law that "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of . . . the improper admission . . . of evidence, . . . unless, after an examination of the entire cause, including the evidence," we are "of the opinion that the error complained of has resulted in a miscarriage of justice."  (Cal. Const., art. VI, § 13.)  "[A] 'miscarriage of justice' should be declared only when" we find "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.)  As to the claim of federal constitutional error, the high court in *Chapman, supra*, 386 U.S. 18, "rejected the argument that errors of constitutional dimension necessarily require reversal of criminal convictions.  And since *Chapman* [the high court] . . . '[has] repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt,' " that it was not "reasonably possible" that the error contributed to the verdict. (*Rose v. Clark* (1986) 478 U.S. 570, 576.)  Despite defendant's arguments to the contrary, we can confidently conclude it is neither reasonably probable (*Watson, supra*, 46 Cal.2d at p. 836) nor

reasonably possible (*Chapman*, *supra*, 386 U.S. at p. 24) that an outcome more favorable to him would have resulted had the prior offense evidence and his statements not been admitted.

Defendant contends the admission of the prior offense evidence was prejudicial because the evidence of forcible penetration was "fairly weak," and thus his statements concerning his prior conduct and sexual motivation likely persuaded any skeptical jurors that he had, in fact, intended to and did accomplish two acts of sexual penetration. We disagree.

There was nothing ambiguous or imprecise about the testimony of the victims. Jane Doe 1 specifically testified defendant penetrated her vagina, while Jane Doe 2 specifically testified defendant's fingers were inside her genital lips and she felt a sensation of grabbing. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1366-1367, 1371 [penetration within the meaning of section 289 is not limited to penetration of the vagina but also includes "intrusion into a victim's " ' "genital opening" ' " by "contact 'between the folds of the skin over [the] vagina' "].) While there are circumstances in which a person may intentionally penetrate another person for purposes other than sexual arousal, gratification, or abuse (*People v. Ngo* (2014) 225 Cal.App.4th 126, 163), this is not one of those cases. Defendant's conduct – penetrating genital openings of victims while they are urinating in porta-potty units – supports no rational explanation other than for the purposes of sexual arousal, gratification, *or* abuse. Moreover, there is no question that defendant accomplished his penetrations by the coercive means of force or fear within the meaning of section 289. By his conduct, defendant violated "the [victims'] enhanced level of

37

security and privacy," providing him with the advantage of "shock and surprise," demonstrating the necessary force and fear within the meaning of section 289. (*Thomas*, *supra*, 15 Cal.App.5th at p. 1071.) And, the videos and digital photographs taken from defendant's cell phones comprised strong circumstantial evidence that defendant was the assailant and had acted for the purposes of sexual arousal, gratification, or abuse.

As to any prejudice arising from Silva's trial testimony, we note the evidence "was no stronger" and far less "inflammatory than the testimony concerning the charged offenses." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) While the prior offense evidence was adverse to defendant, it "was not of such overwhelming force that it would have caused a reasonable juror to abandon the trial court's instructions and presume defendant's guilt" of the charged offenses based on the prior offense. (*People v. Quartermain* (1997) 16 Cal.4th 600, 627 (*Quartermain*).) Given the brief nature of Silva's testimony concerning defendant's conduct in Brazil, contained in seven pages of transcript, we reject defendant's assertion that the jurors were misdirected from careful consideration of the evidence of the charged offenses and were instead distracted with evidence of defendant's conduct in Brazil without knowing the punishment for that conduct. In addition to the court's instruction on the limited nature for which the prior offense evidence had been admitted, the jury was instructed on the specific elements of the charged offenses, that convictions required proof beyond a reasonable doubt, and for each offense a guilty verdict required "proof of the union, or joint operation of act and wrongful intent." "No reasonable juror would believe those requirements could

be satisfied solely by proof of" defendant's statements concerning the prior offense in Brazil. (*Reliford*, *supra*, 29 Cal.4th at pp. 1013-1014.)

Because the admission of the evidence of the prior offense and defendant's statements "did not render the trial fundamentally unfair in violation of due process" (*Quartermain*, supra, 16 Cal.4th at p. 627), as it was in no way outcome determinative, we conclude the complained-of error was harmless under either the *Chapman* or *Watson* standard of review.

## V.    Defendant is Entitled to Additional Presentence Credit

The parties agree, and we concur, that defendant's presentence custody credits were miscalculated as limited to an aggregate of 267 days. Defendant was arrested on May 26, 2019, and sentenced on January 14, 2020. Because custody is calculated to include both the first day in custody and last day in custody, even if only partial days, defendant was in custody for 234 days, and not 233 days as calculated by the trial court. As a necessary corollary, defendant's 34 days of conduct credit, calculated at fifteen percent for the violent felony conviction, should be increased by one day to 35 days for conduct credit. Accordingly, defendant is entitled to a total of 269 days of presentence credit for time served, and on remand, the court is directed to correct the miscalculation in the award.

## VI.   Defendant is Entitled to a New Sentencing Hearing

### A.    Relevant Facts

On January 14, 2020, the trial court sentenced defendant to an aggregate term of 16 years and 8 months, consisting of full consecutive terms of the upper term of eight years on the forcible sexual

penetration offenses (§ 667.6, subd. (d)[9]) plus a consecutive term of eight months (one-third the middle term of two years) on the vandalism offense. The court imposed the lower term of 16 months on the second-degree burglary offense, but stayed execution of that term as it found it was "obligated to" do so under section 654.

The court explained that it was imposing the aggravated terms for the forcible sexual penetration offenses based on several aggravating factors described in the California Rules of Court[10], including that the offenses disclosed a high degree of "callousness" (rule 4.421(a)(1)); the victims were "particularly vulnerable" (rule 4.421(a)(3)); the manner in which the crimes were carried out indicated "planning," "sophistication," and "professionalism" (rule 4.421(a)(8)); and defendant's conduct was "violent" and posed a "danger to society," involving "sexual assault by force" that was not "slight" (rule 4.421(b)(1)).

---

[9] At the time of sentencing, former section 667.6, subdivision (d) provided, in pertinent part: [¶] "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) [i.e. sexual penetration in violation of section 289, subdivision (a)] if the crimes involve separate victims . . . . [¶] . . . [¶] The term shall be served consecutively to any other term of imprisonment and shall commence from the time the person otherwise would have been released from imprisonment. The term shall not be included in any determination pursuant to Section 1170.1. Any other term imposed subsequent to that term shall not be merged therein but shall commence at the time the person otherwise would have been released from prison." Effective January 1, 2022, the Legislature amended subdivision (d) of section 667.6 to designate the unnumbered paragraphs as paragraphs (1), (2), and (3), with nonsubstantive changes to the subdivision. (Stats. 2021, ch. 626, §30.)

[10] All undesignated references to rules are to the California Rules of Court.

## B. Analysis

Defendant argues he is entitled to be resentenced under the new sentencing provisions in section 654 and 1170, subdivision (b), which became effective on January 1, 2022. We agree.

The amended versions of section 1170, subdivision (b), and section 654, which became effective on January 1, 2022, apply retroactively to this case under the general rule that ameliorative changes in the law are applicable to all nonfinal convictions on appeal. (See, e.g., *People v. Frahs* (2020) 9 Cal.5th 618, 627-630; *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307-308.) Effective January 1, 2022, section 1170, subdivision (b), provides, in pertinent part, as follows:

"(b)(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).

"(2) The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements. The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense. [¶] . . . [¶]

"(6) Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower

41

term if any of the following was a contributing factor in the commission of the offense:

"(A) The person has experienced psychological, physical or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.

"(B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.

"(C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking."

Effective January 1, 2022, section 654 reads, in pertinent part:

"(a) An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

We agree with defendant that the case should be remanded for resentencing under the new provisions in section 1170, subdivision (b). The record does not expressly show that the aggravating factors on which the trial court relied were admitted by defendant or found true beyond a reasonable doubt. (§ 1170, subd. (b)(1), (2); Stats. 2021, ch. 731, § 1.3.) Also, the trial court had no reason to consider whether the "aggravating circumstances outweigh[ed] the mitigating circumstances" such that "imposition of the lower term would be contrary to the interests of justice," or whether to impose a lower term if any specified mitigating factors (i.e. psychological, physical, or childhood trauma) were found to be "a contributing factor in the commission of the offense[s]." (§ 1170, subd. (b)(6); Stats 2021, ch. 731, § 3.)

We also agree with defendant that he is entitled to have the trial court reconsider its application of section 654. At the time of the original sentencing, former section 654, subdivision (a), required that a defendant who committed an act punishable by different laws had to be punished under the law that provided for the longest possible term. Under the new law, a trial court now has the discretion to punish a defendant under any of the applicable laws. (§ 654, subd. (a); Stats. 2021, ch. 441, § 1.) At resentencing the trial court will have the opportunity to exercise its discretion to apply section 654 under the new law. Our decision should not be read as expressing an opinion on how the court should exercise its discretion.

CASE NO. A162101

I. **No Error or Abuse of Discretion in Victim Restitution Order**

A. **Relevant Facts**

At a January 14, 2020 sentencing hearing, Jane Doe 1 testified that she had attempted to put the incident behind her but was haunted "daily" and her life had "completely changed." She was suffering from depression and post-traumatic stress disorder and was seeing a therapist. She even suffered back pain as a result of the incident, for which she had received chiropractic care. She had to pay for therapy appointments insofar as they were not covered by insurance, transportation to and from those appointments, and transportation from her home in San Francisco to the Napa court for appearances in the case. In light of defendant's objection to the requested amount of restitution, the court set a date for a restitution hearing.

In late 2020, the prosecution filed a written request seeking victim restitution for Jane Doe 1 in the following amounts: (1) $764.17 for medical visits for gynecological, urgent, and chiropractic care; (2) $160 for therapy sessions; (3) $338.79 for additional chiropractic care; (4) $959.98 in transportation expenses; and (5) $160.29 for one-night hotel stay prior to the date of sentencing.

Defendant opposed certain requests at issue on this appeal: (1) chiropractic care based on the argument that his brief touching of her genitalia in May 2019 would not have caused a back injury requiring such care; (2) transportation expenses for car service rides from San Francisco (Jane Doe 1's home) to Napa (place of trial) on any date she did not actually attend court; and (3) a hotel stay the night before the sentencing hearing as the sentencing took place in the late morning and therefore she could have come from San Francisco (approximately 50 miles away) that same morning.

Before the scheduled restitution hearing, Jane Doe 1 submitted a declaration, together with receipts for chiropractic treatment, transportation costs related to trial court proceedings, and the hotel stay on the day before sentencing. In that declaration, Jane Doe 1 explained that "during the course of the assault," she "quickly turned to try and grab the perpetrator's hand, which caused an injury to her back for which she [sought] regular chiropractic care," paid for "out of pocket." She specifically sought reimbursement for an urgent care visit and back x-ray taken at that visit, explaining that about a month after the assault she "was on a work assignment where regular standing and walking for the assignment was required. While performing my regular job duties, my back locked up as a result of the injury [she]

44

sustained during the assault, and I could not walk, sit, or stand.  [She] needed to go to the Urgent Care in the city I was working in so that I could be prescribed pain medication in order to finish [her] job assignment."  She also sought to recover monies for a total of eight chiropractic visits.

As to transportation costs associated with the trial court proceedings, Jane Doe 1 requested her expenses for 7 days (November 1, 18, 19, 2019, December 3, 4, 5, 2019, and January 13, 2020).  She explained that she "had to go to Napa for meetings with the district attorney's office to prepare for trial, to testify in the trial, and for the sentencing."  As to her hotel stay in Napa on the day before sentencing, she lived in San Francisco.  "The sentencing was in Napa early one morning at 8:30 a.m.  I rely on [a car service] and the ferry to get to Napa.  I could not risk commuting in that morning during rush hour, so I stayed in a hotel the night before."

At the January 7, 2021, restitution hearing, defense counsel did not present any evidence.  The court heard argument from both counsel and took testimony from Jane Doe 1.  She gave further explanations regarding chiropractic visits, and reiterated they were needed due to the injury she had incurred from the sexual assault.  She explained that she had asked her physicians to write a statement (for which she was charged a fee) to document their impressions of her back injury.  She also explained that some of the requested transportation expenses were for payments made for a car service to transport a "percipient witness who was with Jane Doe 1 the night that she was assaulted" to the airport.

Following Jane Doe 1's testimony, defense counsel argued that, while typically a defendant had no ability to seek medical documents substantiating a victim's claim that an injury is related to the incident, in this case Jane Doe 1 mentioned such documents and hence they should be provided to defendant. The prosecutor opposed the request as the information supplied to the court was sufficient to show the expenses were reasonably related to defendant's conduct, retrieving the victim's medical documents was not necessary, and the court could take a sworn affidavit or testimony from a victim.

At the continued hearing on January 13, 2021, the court ruled, in pertinent part, as follows: "The court has read and considered the declaration as well as the supporting documents, and I had a chance to investigate some cases . . . . [¶] And the court is ordering restitution to Jane Doe [1] in the amount of $4,259.60 . . . . The court is awarding all of the therapy costs, the prescription costs, chiropractor costs, and other medical requests. The court is granting the transportation costs minus the . . . rounding up donations. [¶] When the court looks at the tip amount and the tips, the tips seem to be a reasonable cost of procuring a ride from [a car service] . . . . Generally tips are included in . . . government stipends for . . . transportation costs, . . . so the court will be awarding tips; however, the court could find no authority or basis for awarding the donations for rounding up [fares] for charity. But all of the rides are covered including out-of-pocket expenses [for] assisting in the . . . prosecution pursuant to [section] 1202.4[, subd.] (f)(3) and *People* [*v.*] *Rowland* [(1997)] 51 Cal.[App.]4th [1745] at [page] 1754. This includes the hotel costs. The court [is] determining that those are reasonable. . . . So the amount was what was requested minus

46

$5.81." The court further ordered ten percent interest from the date of sentencing because the losses "were clearly incurred beforehand."

## B. Analysis

A trial court has the authority to order victim restitution under section 1202.4, subdivision (f), which provides that "in every case in which a victim has suffered economic loss as a result of defendant's conduct, the court shall require that the defendant make restitution to the victim . . . in an amount established by court order, based on the amount of loss claimed by the victim . . . or any other showing to the court." Section 1202.4, subdivision (f)(3) specifically provides that "[t]o the extent possible, the restitution order . . . shall identify each victim and each loss to which it pertains and shall be of a dollar amount that is sufficient to fully reimburse the victim . . . for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following: . . . (B) Medical expenses. . . . (G) Interest, at the rate of 10 percent per annum, that accrues as of the date of sentencing or loss, as determined by the court."

Additionally, our state Constitution provides crime victims with certain rights "[i]n order to preserve and protect [their] rights to justice and due process," including the right to "restitution," "[t]o prevent the disclosure of confidential information or records to the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, which could be used to locate or harass the victim or the victim's family or which disclose confidential communications made in the course of medical or counseling treatment, or which are otherwise privileged or confidential by law;" and "[t]o reasonable notice of all

47

public proceedings, . . . upon request, at which the defendant and the prosecutor are entitled to be present and . . . , to be present at all such proceedings." (Cal. Const., art. I, § 28, subd. (b)(4),(7),(13).)

The applicable standard of review is abuse of discretion. " 'A victim's restitution right is to be broadly and liberally construed.' " (*People v. Prosser* (2007) 157 Cal.App.4th 682, 686.) " ' " 'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' " ' " (*People v. Baker* (2005) 126 Cal.App.4th 463, 467.) "In reviewing the sufficiency of the evidence, the ' "power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the trial court's findings.' [Citations.] Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. [Citation.] . . . We do not reweigh or reinterpret the evidence; rather we determine whether there is sufficient evidence to support the inference drawn by the trier of fact. [Citation.]" (*Id.* at pp. 468-469.)

In support of her claim for chiropractic treatment expenses, Jane Doe 1 proffered her chiropractic treatment bills listing diagnoses of segmental and somatic dysfunction of the cervical, thoracic and lumbar regions, low back pain, pain in the right and left hips, and "other muscle spasm." At trial and sentencing and at the restitution hearing she explained she had strained her back when she resisted defendant's sexual penetration thereby necessitating chiropractic care.

Defendant's claim that the trial court could not order restitution for the chiropractic treatment expenses in the absence of Jane Doe 1's

medical records is not persuasive. His reliance on the need for expert testimony to prove the element of causation in "the tort and Worker's Compensation context" is misplaced. " ' "Section 1202.4 does not, by its terms, require any particular kind of proof. . . . ' "This is so because a hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution." ' " ' " (*People v. Lockwood* (2013) 214 Cal.App.4th 91, 96; see *People v. Millard* (2009) 175 Cal.App.4th 7, 30 [at restitution hearing the prosecution was "not required to present vocational rehabilitation expert testimony regarding the amount of [victim's] future lost earnings"].) " 'Due process does not require a judge to draw sentencing information through the narrow net of courtroom evidence rules. . . [. S]entencing judges are given virtually unlimited discretion as to the kind of information they can consider and the source . . . whence it comes.' " (*People v. Baumann* (1985) 176 Cal.App.3d 67, 81.) Based on Jane Doe 1's testimony at trial, statement at sentencing, her declaration, her testimony at the restitution hearing, together with her medical bills, the trial court reasonably found Jane Doe 1's strained back injury, necessitating chiropractic treatment, was due to defendant's criminal conduct. The court was free to accept the evidence supporting the restitution award, especially as defendant presented no evidence calling into question Jane Doe 1's explanation as to how she strained her back. Therefore, defendant's challenge to the award of restitution for chiropractic treatment expenses fails.

There is also no merit to defendant's challenge to the award of transportation expenses and hotel costs related to the trial proceedings. The trial court may compensate a victim for any economic loss which is

49

shown to be the direct result of defendant's criminal conduct, even if *it is not enumerated in the restitution statute. (People v. Williams* (2010) 184 Cal.App.4th 142, 147 [only limitation placed on victim restitution is that loss must be an "economic loss" incurred as a result of defendant's criminal conduct]; *People v. Moore* (2009) 177 Cal.App.4th 1229, 1233 ["that the victim's attendance [at trial proceedings] was not mandated by statute, that he was not required to address the court at those hearings, and that he chose to attend the proceedings of his own volition, [did] not relieve [the] defendant from the responsibility to compensate [the victim] for the loss attributable to [the] defendant's criminal conduct]; *People v. Crisler* (2008) 165 Cal.App.4th 1503, 1509 [victim's trial-related expenses need not fall within any of the enumerated categories in statute to qualify for reimbursement].)

In sum, we reject defendant's challenges to the victim restitution awarded to Jane Doe 1 and affirm the award.

## DISPOSITION

### Case No. A159406

The sentences are vacated and the matter is remanded to the trial court to resentence defendant pursuant to the new sentencing laws effective January 1, 2022. After resentencing, the trial court is directed to reflect (in its new sentencing order and abstract of judgment) an award of 234 days of presentence custody credit and 35 days of conduct credit, for a total of 269 days of presentence credit for time served. In all other respects, the judgment is affirmed.

### Case No. A162101

The January 13, 2021 order of restitution is affirmed.

50

_____

Petrou, J.

WE CONCUR:


_____

Fujisaki, Acting P.J.


_____

Chou, J.*


*People v. Fontes/A159406/A162101*

* Judge of the Superior Court of San Mateo County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.